```
COMMONWEALTH OF PENNSYLVANIA

         VS                    District No. 12-3-03

ALSHAQAH TARIQ POWELL
         Defendant



              TRANSCRIPT OF PROCEEDINGS
                OF PRELIMINARY HEARING




    BEFORE:  HONORABLE JOSEPH LINDSEY
             (Sitting for MDJ William Wenner)
    DATE:    DECEMBER 10, 2015

    PLACE:   5925 Stevenson Ave.
             Harrisburg, Pennsylvania




APPEARANCES:


    DAUPHIN COUNTY DISTRICT ATTORNEY'S OFFICE
       By:  David Wilson, Esquire
            For the Commonwealth

    PERRY SHORE WEISENBERGER & ZEMLOCK
       By:  Brian Perry, Esquire

            For - Defendant
```

## INDEX TO WITNESS

| WITNESS | DIRECT | CROSS |
|---|---|---|
| David Long | 4 | 9 |

```
                         P R O C E E D I N G S
       THE COURT:  This is the magisterial court 12-3-03,
and the date and time set for a preliminary hearing where the
Commonwealth has charged Alshaqah Powell with violation of
Title 35; that section dealing with possession with intent to
deliver a controlled substance.
       He is present with Mr. Brian Perry.
       Mr. Perry, do you have a copy of the complaint?
       MR. PERRY:  Yes, Your Honor.
       May I pause for one moment?  He just told me that his
sister is on her way from New Jersey.  Can I text her and tell
her turn around?  No reason to come.  There is no reason to
come.
       (A discussion occurred off the record.)
       THE COURT:  Okay.
       Want to call your first witness?
       MR. WILSON:  I call Trooper Long.
       THE COURT:  For the record, Trooper Long is still
under oath from the previous hearing, so you can have a seat
there.  State your name and spell your last name.
       THE WITNESS:  Trooper David Long, L-o-n-g.



                              DAVID LONG,
being called as a witness and having been previously sworn,
```

```
 1  testified as follows:
 2              DIRECT EXAMINATION
 3  BY MR. WILSON:
 4      Q    By whom are you employed?
 5      A    Pennsylvania State Police.
 6      Q    Do you have a special assignment with the
 7  Pennsylvania State Police?
 8      A    Bureau of Criminal Investigation, Drug Law Division.
 9      Q    How long have you worked for that special unit?
10      A    Approximately two years.
11      Q    And did you have an encounter with Alshaqah Tariq
12  Powell?
13      A    Yes.
14      Q    When was that, approximately?
15      A    Beginning of November.  I think it was the third.
16      Q    Do you need to refer to your paperwork?
17      A    Yes.
18           Yep, November 3rd, 2015, a Tuesday.
19      Q    Where were you when you first observed him?
20      A    Interstate 81, approximately mile marker 75,
21  monitoring southbound traffic.
22      Q    What did you see that drew your attention?
23      A    At that time, there was a black Ford Taurus with a
24  temporary registration with window screening, passed my
25  location at a speed -- I don't have the exact speed, but I
```

1  estimated lower than the posted speed limit, with the operator
2  wearing white headphones while driving the vehicle.
3      Q    Did you come to find out who was the operator of the
4  vehicle?
5      A    Yes.
6      Q    And who was that?
7      A    The defendant sitting in the green jumpsuit.
8      Q    And is it against the law to have your headphones on?
9      A    Yes.
10     Q    What did you do at that point?
11     A    At mile marker approximately 71, I initiated a
12 traffic stop at a wide shoulder and approached the passenger
13 side of the vehicle. The operator was still wearing the
14 headphones at the time. I advised him this stop was being
15 recorded. I advised him that -- the reason for the stop.
16         He said he was talking on his blue tooth, and at that
17 time I informed him that they are considered headphones. He
18 had both ears covered. They were larger. I think they are
19 Beats by Dre. Both headphones were on.
20     Q    Did you take those?
21     A    No.
22     Q    He's still got them? They were left in the vehicle?
23     A    They were left in the vehicle.
24     Q    What happened at that point?
25     A    At that point, I asked for license, registration,

1  insurance.

2  I noticed the vehicle was New Jersey registered --
3  temporary registered. It was a new purchase. I asked him if
4  he owned the car. He said no, his friend owned the car.

5  I asked him who owned the car. He said his friend,
6  Tamiqua, but looking at the temporary registration, Jose was
7  the registered owner. I don't know the last name off the top
8  of my head.

9  I asked for his driver's license. The operator was
10 visibly shaking. His hand was shaking. He provided me a
11 North Carolina identification card.

12 I asked him if he had a license. He said no, he only
13 had an I.D. card.

14 Q   And did you run his name to find out if he is
15 licensed to drive anywhere?

16 A   He is not licensed, from what I found. He only had
17 an I.D. card from North Carolina.

18 Q   What happened at that point?

19 A   At that point, general conversation with him standing
20 outside the vehicle. He explained that he was going to meet
21 his friend Tamiqua for lunch at her work at Wendy's. He said
22 two miles down the road, but he was saying York.

23 From our location to York is approximately, you know,
24 22 to 30 miles, so it wasn't two miles. It was clear he was
25 unsure of his destination.

1  Q    Did you say there was someone else in the car?
2  A    No. He was by himself.
3  Q    By himself. Okay.
4       Continue.
5  A    I was catching an odor in the vehicle. I believed it
6  was marijuana, but it wasn't strong enough to definitively
7  make that decision.
8       I returned to the vehicle, my vehicle, after engaging
9  with the operator, contacted my partner, had him come to the
10 scene. Explained everything I had, ran the operator through
11 CLEAN, N.C.I.C. with criminal history.
12      At that point, after I prepared the written warning,
13 I returned to the vehicle. I asked the driver to step out of
14 the vehicle. I explained that I wanted to search the car. He
15 consented to the search; provided both written and verbal
16 consent.
17      Search of the car was conducted. Located in the
18 trunk by my partner was a bag in the trunk area. I'm not sure
19 exactly what type of bag it was, that contained, I believe it
20 was six -- I would have to reference my report if I had to --
21 paper-wrapped bundles of heroin.
22      A count was later conducted and it was
23 15,217 bags of heroin.
24 Q    Was it field tested?
25 A    Yes.

```
 1    Q    Where is the drugs -- where are the drugs now?
 2    A    I believe they are at the State Police laboratory.
 3    Q    Being tested to determine if they were heroin?
 4    A    Tested and weighed, yes.
 5    Q    Did he say anything to you about whether or not these
 6  belonged to him?
 7    A    To me?  No.
 8         MR. WILSON:  That's all I have.  If you could answer
 9  counsel's questions.
10         THE COURT:  Cross, Mr. Perry.
11         CROSS-EXAMINATION
12  BY MR. PERRY:
13    Q    Good morning.  Feels like we just did this.
14         So you are on 81 looking southbound?
15    A    Yes.
16    Q    Mile marker 75?
17    A    Approximately.
18    Q    We are going to speed this one up.  We just went
19  through this.
20         That's the median strip.
21    A    Yes.
22    Q    You are in a specialized drug interdiction detail?
23    A    Yes.
24    Q    81 is a major corridor, drug trafficking corridor, in
25  our area?
```

```
 1    A    Yes.
 2    Q    Connecting major cities?
 3    A    Yes.
 4    Q    You are trained to look for certain things while you
 5  are watching vehicles pass?
 6    A    Sure, yes.
 7    Q    The last hearing you described them as things like
 8  rental cars, single occupants, drivers looking away, lane
 9  changes, etcetera; is that accurate?
10    A    Yeah, a lot of stuff.
11    Q    Among other things?
12    A    Yes.
13    Q    In this particular case -- this was on
14  November 3rd, 2015?
15    A    Yes.
16    Q    Do you remember the approximate time of day?
17    A    It was earlier morning.  I can look at my report if
18  you need me to.
19    Q    Ballpark.
20         Do you recall how heavy the traffic was?
21    A    I believe it was pretty light.  I mean, considering
22  if 81 is light ever, but it was on the lighter side, yes.
23    Q    Is the vehicle that catches your eye, is it in the
24  passing lane?
25    A    Right lane.
```

```
 1    Q    The slow lane?
 2    A    Slow lane, sorry.
 3    Q    You see what from the median?
 4    A    As the vehicle passed my location, he's driving at a
 5  slower speed.  Again, I don't have the exact.  I wasn't rung
 6  radar.  He appeared to be driving under the speed limit.
 7    Q    Okay.
 8    A    Windows are tinted.  I don't want to say it's dark
 9  sun screening, but enough that I can visibly see white
10  headphones as it passes my location.
11    Q    So it is an out-of-state vehicle?
12    A    Well, after I caught up to it, I realized it was a
13  temporary tag, a paper tag, on the vehicle.
14    Q    I understand after-market tinting in Pennsylvania is
15  illegal.  If it's on the tint meter at certain numbers, it's
16  illegal?
17    A    All states have a certain minimum.
18    Q    Is it necessarily in Pennsylvania, if you have an
19  out-of-state vehicle and you see after-market tint go by, do
20  you automatically pull the vehicle over?
21    A    Not automatically, no.
22    Q    But, this particular case, you see -- you used a
23  motion with your hand, a larger head phone on one of his ears?
24    A    Yes.
25    Q    You can see it's a male?
```

1   A   Yes.
2   Q   And do you know at that moment when you see the
3   vehicle pass -- so you're in the median.  Are you looking
4   straight ahead, you see the car coming from your right to your
5   left; right?  Correct?
6   A   Yes.
7   Q   So you see the driver's left ear?
8   A   Yes.
9   Q   Can you tell at that point whether the other head
10  phone, the right head phone, is on his ear or off his ear when
11  he passes you?  Can you see it?
12  A   No.
13  Q   He doesn't turn to look at you, right?
14  A   Right.
15  Q   He does not turn away?
16  A   Correct.
17  Q   But that's the basis of the stop, right, the
18  headphones?
19  A   Yes.
20  Q   And at the point you make the determination for the
21  basis of the stop, you can't see his right ear, can you?
22  A   When I make the stop?
23  Q   When you make the decision to follow him, that leads
24  to ultimately making the stop?
25  A   Right.  No, I could not.

1  Q    And it is not illegal to have one ear -- a headphone
2  on one ear, is it?
3  A    No.
4  Q    So you can have Beats by Dr. Dre on one, as long as
5  it's off the other, correct?
6  A    Correct.
7  Q    And at the time you make the decision to follow, you
8  don't know whether that right --
9     MR. WILSON:  Judge, I object.  That's been asked and
10 answered.
11    MR. PERRY:  I want to make sure the record is clear.
12    THE COURT:  Sustained.
13 BY MR. PERRY:
14 Q    You then pull out, employ catchup speed to follow the
15 car, correct?
16 A    Correct.
17 Q    And when you eventually go lights and sirens, does
18 the vehicle pull over immediately?
19 A    Yes.
20 Q    When the vehicle pulls over and you come up behind
21 it, you then see that driver has both ear phones on, right?
22 A    Yes.  It appeared that way from my vantage point.
23 Q    Does he take them off when you approach?
24 A    Yes.
25 Q    Before you approach?

1    A    No.  I believe it was -- I was standing there.  He
2  was on the phone as I approached him.
3    Q    All right.  He appeared nervous?
4    A    Yes.
5    Q    He didn't have a driver's license?
6    A    Correct.
7    Q    At that point, you say, "I think I smell marijuana,
8  but I'm not sure?"
9    A    Correct.
10   Q    It wasn't clear to you at that point that he smelled
11 like marijuana -- anything smelled like marijuana?
12   A    Correct.
13   Q    But you still got him out of the vehicle?
14   A    Yes.
15   Q    It is safe to assume, then, he is not free to leave?
16   A    Yes.
17   Q    What do you see from your vantage point looking in?
18 Do you see anything in plain view?
19   A    There was a prescription pill bottle on the passenger
20 side rear floor.
21   Q    Did you ask him about it?
22   A    I don't know if I did or my partner did.  One of us
23 did ask him about it.
24   Q    What was the answer?  Do you remember?
25   A    I don't know.

1  Q    But it sounds like you don't see anything that's
2  obviously contraband or incriminating from the outside of the
3  vehicle at that point?
4  A    Correct.
5  Q    Is it true, though, that you said you called for your
6  partner?
7  A    Correct.
8  Q    Who's the partner?
9  A    Trooper Martin.
10 Q    The gentleman here?
11 A    Yes.
12 Q    Didn't it take like 45 minutes for him to get there?
13      MR. WILSON:  Objection, relevance.
14      MR. PERRY:   I'm just wondering how long it took.
15      THE COURT:   Sustained.
16      MR. PERRY:   Sustained or overruled?
17      THE COURT:   Sustained.
18 BY MR. PERRY:
19 Q    Did he eventually show up?
20 A    Yes.
21 Q    But Mr. Powell is on the side of the road in your
22 custody until he shows, correct?
23 A    Correct.
24 Q    No drug dog is called?
25 A    One was called, yes.

```
1    Q    Did the dog hit on the car?
2    A    The dog wasn't ran.  He gave consent prior to the dog
3  arriving.
4    Q    Chronologically, he's taken out of his car, put into
5  custody?
6    A    (No response.)
7    Q    Where is -- Where is he at this time waiting for the
8  other trooper?
9    A    Sitting in his car.
10   Q    In his car?
11   A    Yes.
12   Q    Not free to leave?
13   A    Yes.
14   Q    That other trooper shows up?
15   A    Yes.
16   Q    When does the drug dog show up?
17   A    He never shows up.
18   Q    He was called?
19   A    Called.  Never showed up.
20   Q    You re-engage Mr. Powell while he is sitting in the
21 vehicle?
22   A    I don't know.
23   Q    How do you get consent?
24   A    He's out of the car.
25   Q    I thought you said he was in his car waiting for the
```

```
 1  other trooper?
 2      A    He was in his car waiting for the other trooper.  As
 3  I get him out, I ask for consent.
 4      Q    So you re-engaged.  You went back to him and said,
 5  "Step out," again?
 6      A    He only stepped out once.
 7      Q    So he's on the side of the road in his vehicle?
 8      A    Yes.
 9      Q    And you are waiting for the other trooper to come?
10      A    Yes.
11      Q    Okay.  And other troopers arrive.  When and why do
12  you ask for consent?
13      A    I believe I had reasonable suspicion.
14      Q    Based on what?
15      A    He didn't --
16      Q    He didn't object.
17      A    Third party vehicle, gave me the wrong owner at the
18  time, unsure destination, conflicting story of whether he was
19  coming from New Jersey or, I believe he said, Stroudsburg,
20  Pennsylvania.
21      Q    And you said -- eventually, you say, "Can I search
22  your vehicle?"
23      A    Yes.
24      Q    He says, "It's not my vehicle?"
25      A    I don't know what he said.
```

```
 1    Q    Well, it wasn't his vehicle, right?
 2    A    It wasn't his vehicle, no.
 3    Q    And do you search it right on the scene?
 4    A    Yes.
 5    Q    When you find the heroin in the trunk --
 6    A    Yes.
 7    Q    -- what does he say?
 8    A    I don't know.  I was in the car.
 9    Q    Did you ever confront him with it?
10    A    I didn't, no.
11    Q    Did anybody?
12    A    I believe Trooper Martin did.
13    Q    Did he acknowledge that he knew it was there?
14    A    I don't believe so.  I don't know.
15    Q    Were some Indian cigarettes found?
16    A    On his person?
17    Q    What are they?
18    A    He told me it's something that smelled like
19 marijuana.
20    Q    Okay.  Did you seize those?
21    A    No.
22    Q    Did you ever smell them to see if they do smell like
23 marijuana?
24    A    I smelled the pack.  It didn't smell like marijuana
25 to me.
```

```
 1   Q    Any other money or packaging materials found?
 2   A    I don't believe so, no.
 3   Q    Did you seize his cell phone?
 4   A    I believe there were two cell phones we seized.
 5   Q    Are they being examined?
 6   A    I don't know.  I can't answer that.
 7   Q    Do you know how the vehicle got back to the owner?
 8   A    No.
 9   Q    Is the vehicle still in your custody?
10   A    No.
11   Q    So it was released to somebody?
12   A    It was released to the tow company.
13   Q    Did the tow company then, if you know, release it
14   back to the owner?
15   A    I don't know.
16        MR. PERRY:  Thank you, sir.
17        THE COURT:  Anything on redirect?
18        MR. WILSON:  No, Judge.
19        THE COURT:  Trooper, you can step down.
20        Do you have anything further?
21        MR. WILSON:  The Commonwealth rests.
22        THE COURT:  Mr. Perry.
23        MR. PERRY:  Mr. Powell understands that you cannot
24   suppress evidence and that's for a higher court.  We
25   understand what will happen.
```

1  THE COURT: The Court is going to bind the matter
2  over. I feel they have established a prima facie case for the
3  purpose of this hearing.
4  Any thought of waiving formal arraignment?
5  MR. PERRY: Not yet.
6  Your Honor, bail is one million dollars. We ask the
7  Court consider a reasonable bail reduction.
8  We understand it won't be zero bail, but it's a
9  million dollars. It's way excessive.
10  MR. WILSON: He's out of state.
11  THE COURT: Hold on. What is the street value?
12  Because I have never been in business before. I have no clue
13  what you are talking. Can you give me an approximation?
14  Either of you two?
15  THE WITNESS: Between 150- and 200,000, depending on
16  where it was going in the country.
17  THE COURT: Now you can argue.
18  MR. WILSON: I was going to add, it sounds like he
19  lives in North Carolina. He's not local.
20  THE COURT: If that's where he truly lives -- based
21  on the testimony here, he didn't know where he was. I deny
22  the motion, Mr. Perry.
23  The next appearance for the Defendant is formal
24  arraignment, which is scheduled for Friday, January 29, 2016,
25  at 2:30 in the afternoon, sir.

```
 1          If you are still in jail at that time, then Dauphin
 2   County authorities will see that you get arraigned.  If you
 3   should be released, it is your responsibility to make sure
 4   that you appear.  Failure to appear and not being incarcerated
 5   could result in you being picked up on the bench warrant and
 6   being placed in Dauphin County Prison without bail.
 7          Hearing is adjourned.
 8          (The proceedings concluded at 11:27 a.m.)
```